1

2

3

4

5                    **UNITED STATES DISTRICT COURT**

6                         **DISTRICT OF NEVADA**

7

8   TRACY PETROCELLI,                    )
                                         )        3:94-cv-0459-RCJ-VPC
9          Petitioner,                   )
                                         )
10  vs.                                  )        **ORDER**
                                         )
11  RENEE BAKER, *et al.*,               )
                                         )
12         Respondents.                  )
                                         )
13  _____/

14

15  <u>Introduction</u>

16          This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by

17  Tracy Petrocelli, a Nevada prisoner sentenced to death.  The case is before the court for resolution

18  of the merits of the claims remaining in Petrocelli's fourth amended petition for a writ of habeas

19  corpus.  The court will deny Petrocelli's petition and direct that judgment be entered accordingly.

20  <u>Background Facts and Procedural History</u>

21          In its January 4, 1985, decision on Petrocelli's direct appeal, the Nevada Supreme Court

22  stated, as follows, the facts of the case as revealed by the evidence at trial:

23          Tracy Petrocelli's journey to Reno began in Washington where he killed his
            fiancee. He fled Washington and apparently drove to Colorado in a Corvette, to
24          Oklahoma in a van and to Reno in a Datsun which he stole while "test driving" the
            vehicle. Upon arriving in Reno, Petrocelli decided he needed a four-wheel drive truck
25          to get around in the snow. The next day, his search for a vehicle ultimately led to a
            local used car dealer. The dealer, James Wilson, acceded to Petrocelli's request for a
26          test drive of a Volkswagen (VW) pickup, and the two drove off with the dealer at the
            wheel. At about 1:30 p.m., a Dodge dealer saw them driving north on Kietzke Lane.

1    Approximately forty-five minutes later, a Reno patrolman saw one person driving a truck matching the description of the VW speeding toward Pyramid Lake.

2

3    That evening, Petrocelli was picked up on the Pyramid Highway and given a ride to Sutcliffe. He told the driver that his motorcycle had broken down. In Sutcliffe, Petrocelli got a ride to Sparks with a local game warden. Petrocelli then took a cab to Reno and apparently paid his fare from a two-inch roll of bills.

4

5    The next day, the game warden and his partner looked for Petrocelli's motorcycle. Instead, they found the VW truck with bloodstains and bullet holes on the passenger side. The car dealer's body was found later that day in a crevice, covered with rocks, sagebrush and shrubbery. His back pockets were turned slightly inside out and empty; his wallet was missing. The victim, who usually carried large amounts of cash with him, had been shot three times with a .22 caliber weapon. One shot was to the neck; another shot was to the heart. The third shot was to the back of the head from a distance of two to three inches.

6

7

8

9

10    In the abandoned truck, .22 caliber bullet casings were found. When he was arrested, Petrocelli was carrying a .22 caliber semi-automatic pistol which he testified he always carried loaded and ready to fire. Ballistics tests on the casings found in the abandoned VW revealed that they had been fired from Petrocelli's pistol. Tests on the bullet found in Wilson's chest and a test bullet fired from Petrocelli's pistol also revealed similar markings.

11

12

13    At trial, Petrocelli provided his own account of the killing. After driving off the car lot, the car dealer stopped at a gas station and filled the truck. From the station, Petrocelli drove the truck. He and Wilson proceeded to argue about the price of the truck. Petrocelli laid $3,500.00 on the dashboard and offered a total of $5,000.00 cash. The car dealer was insulted and called him a "punk." Later, on the way back, Wilson twice grabbed for the steering wheel. Petrocelli then pulled out his pistol and said: "Now who is the punk." The victim laughed and said he had a gun also, although Petrocelli never saw one. The car dealer tried to take the pistol from Petrocelli as he continued to drive. As they struggled, the gun went off two or three times. Petrocelli testified, "I knew it was shooting, and I was just trying to pull it away from him.... It was an accident. It was an accident. I didn't do anything. I just tried to keep him from getting the gun." Petrocelli drove to a nearby doctor's office, went up to the door, but did not go in because he "didn't know how to tell him [doctor] there was someone hurt, shot in the car." Thereafter, Petrocelli went to a bowling alley and called the hospital, but "didn't know what to say." He then returned to the truck, drove to Pyramid Lake and hid the car dealer's body under some rocks. Petrocelli began walking after his truck bogged down, but then returned to the vehicle to retrieve his gloves and the gun. He also picked up the car dealer's wallet, took his money, threw the business and credit cards into the wind, and discarded the wallet. Petrocelli then walked to the highway where he obtained rides back to Reno.

14

15

16

17

18

19

20

21

22

23

24    *Petrocelli v. State*, 101 Nev. 46, 48-49, 692 P.2d 503, 505-06 (1985) (emendations in original).

25

26

1    Petrocelli was convicted by a jury of first degree murder and robbery with the use of a deadly

2    weapon. *See* Exhibits 4, 5 (ECF No. 163-2, pp. 12-17).[1]  He was sentenced to death for the murder,

3    and to thirty years in prison for the robbery. *See id*.

4    Petrocelli appealed. *See* Exhibit Z (ECF No. 75-1, pp. 117-64) (opening brief); Exhibit AA

5    (ECF No. 76, pp. 2-49) (answering brief); Exhibit BB (ECF No. 76, pp. 50-75) (reply brief).  The

6    Nevada Supreme Court affirmed on January 4, 1985. *Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503

7    (1985); *see also* Exhibit 9 (ECF No. 163-3, pp. 1-27).  Petrocelli's petition for rehearing was denied

8    on March 19, 1985.  Exhibit II (ECF No. 118-19).

9    On August 12, 1985, Petrocelli filed a petition for post-conviction relief in the state district

10   court.  Exhibit H (ECF No. 70-2, pp. 72-81).  On March 20, 1985, the state district court held an

11   evidentiary hearing.  Exhibit Y (ECF No. 75, p. 133 - ECF No. 75-1, p. 115) (transcript).  On

12   December 31, 1986, the state district court denied the petition.  Exhibit I (ECF No. 70-2, p. 138 -

13   ECF No. 70-3, p. 8).  Petrocelli appealed.  Exhibit JJ (ECF No. 76, pp. 121-42 (opening brief);

14   Exhibit KK (ECF No. 76, p. 143 - ECF No. 76-1, p. 31) (answering brief); Exhibit LL (ECF No.

15   76-1, pp. 32-49) (reply brief).  On June 23, 1988, the Nevada Supreme Court dismissed the appeal.

16   Exhibit NN (ECF No. 76-1, pp. 51-56).[2]

17   On August 24, 1988, Petrocelli filed a petition for writ of habeas corpus in this court,

18   initiating the case of *Petrocelli v. Whitley*, CV-N-88-0446-HDM.[3]  Exhibit 16 (ECF No. 164, pp.

19   2-17).  Counsel was appointed to represent petitioner. *See* Exhibits 2 and 5 to Respondents'

20

21

---

22   [1]  Unless otherwise noted, the exhibits identified by numbers in this order were filed by

23   Petrocelli, and are located in the record at ECF Nos. 163 through 169.  And, unless otherwise noted, the exhibits identified by letters in this order were filed by respondents, and are located in the record at

24   ECF Nos. 36 and 70 through 76.

25   [2] The court refers to this state-court proceeding as Petrocelli's "first state habeas action."

26   [3]  The court here uses its older system of file numbers to identify Petrocelli's first federal habeas action.  Using the court's current file number system, that case would be identified as *Petrocelli v. Whitley*, 3:88-cv-0446-HDM.

1   February 7, 1997 Filing (ECF No. 55).[4]  On May 31, 1989, upon a motion by Petrocelli, the court

2   ordered his first federal habeas action, case number CV-N-88-0446-HDM, dismissed without

3   prejudice, to allow him to return to state court to further exhaust his claims.  *See* Exhibits 6, 7, 8, 9,

4   10, and 11 to Respondents' February 7, 1997 Filing.

5        On March 10, 1989, Petrocelli filed a petition for writ of habeas corpus in state district

6   court.  Exhibit PP (ECF No. 36, pp. 19-26).  The state district court dismissed that petition on

7   January 22, 1992.  Exhibit UU (ECF No. 36, pp. 109-23).  Petrocelli appealed.  *See* Exhibit WW

8   (ECF No. 36, p. 125 - ECF No. 36-1, p. 38) (opening brief); Exhibit XX (ECF No. 36-1, pp. 40-94)

9   (answering brief); Exhibit YY (ECF No. 36-1, pp. 95-104) (reply brief).  The Nevada Supreme

10  Court dismissed the appeal on December 22, 1993.  Exhibit ZZ (ECF No. 36-1, p. 106 - ECF No.

11  36-2, p. 1).[5]

12       Petrocelli then initiated this, his second, federal habeas corpus action, on July 13, 1994.

13  He filed the original petition for writ of habeas corpus in this action on October 28, 1994 (ECF No.

14  4).  Counsel was appointed for Petrocelli (ECF Nos. 7, 8, 24).  On February 9, 1996, Petrocelli filed

15  a first amended habeas petition (ECF No. 28).

16       Respondents then filed a motion to dismiss, arguing that certain claims in the first amended

17  petition were unexhausted, procedurally barred, and constituted an abuse of the writ (ECF No. 36).

18  The court granted that motion, in part, and dismissed five claims from the first amended petition

19  (ECF Nos. 46, 56).  In a subsequent order, entered September 30, 1997, the court denied the first

20  amended habeas petition, ruling that certain claims in it were an abuse of the writ and that certain

21  claims were procedurally defaulted, and denying the remainder of the claims on their merits

22  (ECF No. 78).  Judgment was entered (ECF No. 79).

23

24       [4]  On February 7, 1997, in this case, respondents filed a document entitled: "Response to
    Petitioner's Explanation Why Grounds 26, 27, 28, 6 and 9 Should Not Be Barred As An Abuse of the

25  Writ" (ECF No. 55) ("Respondents' February 7, 1997 Filing").  Attached to that document are eleven
    exhibits, which are copies of documents filed in *Petrocelli v. Whitley*, CV-N-88-0446-HDM.

26

         [5]  The court refers to this state-court proceeding as Petrocelli's "second state habeas action."

1    Petrocelli appealed (ECF No. 80).  On March 8, 2001, the court of appeals affirmed in part,

2  reversed in part, and remanded.  *Petrocelli v. Angelone*, 248 F.3d 877 (9th Cir.2001) (copy of

3  opinion in record at ECF No. 88).  The court of appeals affirmed this court's denial, on the merits, of

4  certain of Petrocelli's claims, and reversed this court's determinations that certain claims were an

5  abuse of the writ and that certain claims were procedurally defaulted.  *Id*.  The court of appeals

6  remanded for further proceedings.  *Id*.

7    Following the remand, the district court heard from the parties regarding the status of the

8  remanded claims, with respect to the exhaustion of those claims in state court (*see* ECF Nos. 92, 93,

9  94, 97, 98, 99, 101).  In an order entered February 7, 2003 (ECF No. 100), the court ruled that the

10  remanded claims were "mixed," meaning that some of them had been exhausted in state court and

11  some had not.  The court extended to Petrocelli the opportunity to amend his petition to remove the

12  unexhausted claims, and exhaust those claims in state court during a stay of this action.  Petrocelli

13  opted to take that course:  he filed a second amended petition (ECF No. 104), and then, to correct

14  typographical errors, a third amended petition (ECF No. 108), and on May 28, 2003, the court

15  ordered this action stayed pending Petrocelli's exhaustion of claims in state court (ECF No. 109).

16    On August 11, 2003, Petrocelli filed a petition for writ of habeas corpus in the state district

17  court.  Exhibit 26 (ECF No. 165, pp. 2-43).  Petrocelli later filed a supplement to that petition.

18  Exhibit 32 (ECF No. 165-3, pp. 80-93).  The state district court held evidentiary hearings.  Exhibits

19  29, 30, 31 (ECF No. 165-2, and ECF No. 165-3, pp. 2-78) (transcripts).  The petition was denied and

20  dismissed by the state district court on April 14, 2006.  Exhibit 36 (ECF No. 166, pp. 30-40).

21  Petrocelli appealed.  *See* Exhibit 38 (ECF Nos. 166-2, 166-3) (opening brief); Exhibit 39 (ECF No.

22  166-4) (answering brief); Exhibit 40 (ECF Nos. 166-5, 167) (reply brief).  The Nevada Supreme

23  Court affirmed on July 26, 2007.  Exhibit 41 (ECF No. 167-2, pp. 2-15 ).[6]

24    On November 16, 2007, upon a motion by Petrocelli, the stay of this action was lifted

25  (ECF No. 147).  On January 11, 2009, Petrocelli filed his fourth amended petition for writ of habeas

26  _____

[6] The court refers to this state-court proceeding as Petrocelli's "third state habeas action."

1   corpus (ECF No. 162).  The fourth amended petition is now Petrocelli's operative petition.  It

2   includes 31 claims for habeas corpus relief, including several with subparts.

3       On May 26, 2009, respondents filed a motion to dismiss (ECF No. 173).   The court ruled on

4   that motion on March 23, 2010 (ECF No. 200), granting it in part and denying it in part.  The court

5   dismissed Grounds 1, 2, 3, 4, 5, 6(a), 6(b), 7(a), 7(c), 7(d), 8(a), and 8(c), of Petrocelli's fourth

6   amended petition.  *See* Order entered March 23, 2012 (ECF No. 200), p. 37.  In addition, the court

7   found the following claims to be unexhausted in state court:  Grounds 7(e), 8(b), 9, 11, 14, 15(a),

8   15(b), 15(c), 15(d), 15(e), 16(a), 16(b), 16(c), 16(d), 16(e), 16(f), 16(g), 16(h), 16(i), 17, 18, 19, 20,

9   21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31.  *Id*. at 37-38.  With respect to the unexhausted claims,

10   the court ordered that Petrocelli was to abandon those claims, make a motion for a stay of this action

11   to allow him to return to state court to exhaust those claims, or face dismissal of his entire action

12   under *Rose v. Lundy*, 455 U.S. 509 (1982).

13       On April 20, 2010, Petrocelli filed a motion for reconsideration, requesting that the court

14   reconsider the dismissal of Grounds 3 and 4 (ECF No. 201).  The court denied that motion in an

15   order entered on August 10, 2010 (ECF No. 209).

16       On April 21, 2010, Petrocelli filed a motion for stay, requesting that this federal action be

17   stayed again while he returns to state court to exhaust his unexhausted claims (ECF No. 203).  The

18   court denied the motion for stay in an order entered on March 10, 2011 (ECF No. 218).

19       On April 6, 2011, Petrocelli filed a motion for reconsideration, asking the court to reconsider

20   its denial of his motion for stay (ECF No. 220).  The court denied that motion for reconsideration on

21   October 5, 2011 (ECF No. 224).

22       Petrocelli then filed a motion (ECF No. 225) requesting permission to appeal the denial of

23   the motion for stay.  Petrocelli also filed, in the court of appeals, a petition for extraordinary writ of

24   mandamus, contesting the denial of that motion, as well as an emergency motion for stay pending

25   determination of the petition for a writ of mandamus.  *See* Notice of Filings, filed October 31, 2011

26   (ECF No. 226). On November 3, 2011, the court of appeals denied the petition for writ of mandamus

1   and the emergency motion for stay (ECF No. 227).  On December 7, 2011, the court denied the

2   motion requesting permission to appeal (ECF No. 231).

3           On November 4, 2011, Petrocelli filed a notice of abandonment of unexhausted claims,

4   abandoning the claims held by the court to be unexhausted (ECF No. 228).  This left, in the fourth

5   amended petition, the following claims to be resolved on their merits: Grounds 6(c), 6(d), 7(b), 7(f),

6   10, 12, and 13.

7           Respondents filed an answer (ECF No. 239), responding to the remaining claims in the

8   fourth amended petition, on April 3, 2012.  Petrocelli filed a reply on July 18, 2012 (ECF No. 245).

9   <u>Standard of Review</u>

10          Petrocelli's federal habeas corpus action was initiated, and his original habeas corpus

11  petition filed, prior to enactment of the Antiterrorism and Effective Death Penalty Act of 1996

12  ("AEDPA").  *See* Petition for Writ of Habeas Corpus (ECF No. 4), filed October 28, 1994.

13  Therefore, pre-AEDPA standards apply.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).

14          Respondents argue that, because the operative amended habeas petition, Petrocelli's fourth

15  amended petition, was filed after the enactment of AEDPA, the standard of review imposed by

16  AEDPA should apply.  *See* Answer (ECF No. 239), pp. 15-24.  That argument, however, runs

17  contrary to Ninth Circuit precedent.  *See Thomas v. Chappell*, 678 F.3d 1086, 1100-01 (2012), *cert.*

18  *denied*, 133 S.Ct. 1239 (2013).  In *Thomas*, the court of appeals stated:

19          We have consistently held that where, as here, a petitioner filed a habeas application
            before the effective date of AEDPA and the district court retained jurisdiction over
20          the case, AEDPA does not apply even if the petitioner files an amended petition after
            the effective date of AEDPA.

21

22  *Thomas*, 678 F.3d at 1100; *see also Sivak v. Hardison*, 658 F.3d 898, 905 (9th Cir. 2011 (applying

23  pre-AEDPA standards where initial petition was filed prior to AEDPA's enactment and amended

24  petition was filed after AEDPA's enactment); *Allen v. Roe*, 305 F.3d 1046, 1049 & n.1 (9th Cir.

25  2002) (same); *Robinson v. Schriro*, 595 F.3d 1086, 1098-99 (9th Cir.), *cert. denied*, 131 S. Ct. 566

26  (2010) (same); *Hamilton v. Ayers*, 583 F.3d 1100, 1105 (9th Cir.2009) (same); *Jackson v. Brown*,

1    513 F.3d 1057, 1068-69 (9th Cir.2008) (same).  The court, therefore, applies pre-AEDPA standards

2    to Petrocelli's claims.

3         Applying pre-AEDPA standards, the court reviews questions of law, and mixed questions of

4    law and fact, de novo, with no deference to the state court's legal conclusions.  *Williams v. Taylor*,

5    529 U.S. 362, 400 (2000); *Dubria v. Smith*, 224 F.3d 995, 1000 (9th Cir.2000) (en banc); *McKenzie*

6    *v. McCormick*, 27 F.3d 1415, 1418 (9th Cir.1994) (en banc).  A petitioner "must convince the

7    district court 'by a preponderance of evidence' of the facts underlying the alleged constitutional

8    error."  *McKenzie*, 27 F.3d at 1418-19 (citing *Johnson v. Zerbst*, 304 U.S. 458, 469 (1938), and

9    *Bellew v. Gunn*, 532 F.2d 1288, 1290 (9th Cir.1976)).  The court presumes "that the state court's

10   findings of historical fact are correct and defer[s] to those findings 'in the absence of convincing

11   evidence to the contrary' or a demonstrated lack of 'fair support in the record.'"  *Mayfield v.*

12   *Woodford*, 270 F.3d 915, 922 (9th Cir.2001) (en banc).

13   Analysis

14        Ground 6(c)

15        In Ground 6(c) of his fourth amended petition, Petrocelli claims that his constitutional rights

16   were violated "due to the failure of trial counsel to provide reasonably effective assistance at the

17   guilt/innocence phase of his trial," "for failing to object to the admission of the handgun." Fourth

18   Amended Petition (ECF No. 162), pp. 144, 150.

19        In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

20   prong test for analysis of claims of ineffective assistance of counsel:  a petitioner claiming

21   ineffective assistance of counsel must demonstrate (1) that his attorney's representation "fell below

22   an objective standard of reasonableness," and (2) that the attorney's deficient performance

23   prejudiced the defendant such that "there is a reasonable probability that, but for counsel's

24   unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S.

25   at 688; *see also id*. at 694.  "A reasonable probability is a probability sufficient to undermine

26   confidence in the outcome."  *Id*. at 694.

8

1    Petrocelli presented this claim to the Nevada Supreme Court on his appeal from the dismissal

2    of his second state habeas petition.  *See* Appellant's Opening Brief, Exhibit WW, pp. 9-13.  In its

3    order dismissing Petrocelli's appeal, the Nevada Supreme Court stated the following:

4              Petrocelli was arrested by a SWAT team in his home, taken outside and
        handcuffed. The police then performed a protective sweep of the house during which
5        time they found a pistol in a flight bag in the bedroom closet. The pistol was later
        determined to be the murder weapon. At trial, the State offered the murder weapon
6        into evidence without objection from Petrocelli's counsel. Petrocelli now claims that
        the seizure of the murder weapon violated the United States Supreme Court's
7        standards for protective sweeps in *Maryland v. Buie*, 494 U.S. 325 (1990), and
        adopted by this court in *Hayes v. State*, 106 Nev. 543, 797 P.2d 962 (1990). He
8        maintains that the trial testimony of the arresting officers did not show the specific
        and articulable grounds necessary to support a reasonable belief that there was
9        someone in the house posing a danger to the officers. In addition, he contends that the
        murder weapon was not in plain view, thus necessitating a search warrant.
10
              The seizure of the murder weapon was arguably unlawful. The search of a
11       flight bag in a closet was not within the realm of a protective sweep. Therefore,
        Petrocelli's counsel should have objected to the admission of the murder weapon.
12       However, even though trial counsel's failure to object possibly fell below an
        objective standard of reasonableness, the requisite prejudice is not present. There was
13       overwhelming evidence of Petrocelli's guilt apart from the admission of the murder
        weapon, primarily from Petrocelli's own testimony. Therefore, even if trial counsel
14       was ineffective, the ineffectiveness did not prejudice the outcome of Petrocelli's case.
        In turn, appellate counsel and post-conviction counsel were not ineffective for failing
15       to raise this issue.

16   Order Dismissing Appeal, Exhibit ZZ, p. 5 (ECF No. 36-1, p. 110).[7]

17   Petrocelli raised this claim as Ground 16 in his first amended petition in this action.  *See* First

18   Amended Petition (ECF No. 28), p. 15.  This court dismissed that claim on procedural grounds.  The

19   court of appeals reversed that ruling, and remanded the claim for a determination either on other

20   procedural grounds or on the merits.  *See Petrocelli v. Angelone*, 248 F.3d 877, 887-88 (9th Cir.

21   2001).

22   This court agrees with the analysis of the Nevada Supreme Court.  There is no conceivable

23   way that the admission of the murder weapon into evidence prejudiced Petrocelli's defense.  At trial,

24

25   _____

26   [7] As is discussed above, Petrocelli's claims are subject to pre-AEDPA standards.  In this order,
     the court notes the state courts' rulings on Petrocelli's claims, but does not afford those rulings
     deference.  The court reviews questions of law, and mixed questions of law and fact, de novo.

1   there was no question who killed Wilson, and there was no question what weapon was used.  *See*

2   Petrocelli's Opening Statement, Exhibit P, pp. 5-14 (ECF No. 73-1, pp. 66-75).

3        The evidence showed that the victim, James Wilson, took Petrocelli for a test drive in Reno

4   in a Volkswagen pickup truck.  *See* Testimony of Eddie Wilson, Exhibit M, pp. 60-72 (ECF No. 72-

5   1, pp. 51-63).  Later that night, Petrocelli was walking in cold, snowy weather near the west shore of

6   Pyramid Lake, about 30 miles from Reno, when he asked a passing motorist for, and was given, a

7   ride to a small store.  *See* Testimony of Don Dalton, Exhibit M, pp. 77-89 (ECF No. 72-1, pp. 68-

8   80).  Petrocelli went into that store, appearing tired and cold, and asked for a ride to Reno.  *See*

9   Testimony of Stanley Williams, Exhibit M, pp. 89-101 (ECF No. 72-1, pp. 80-92).  A Pyramid Lake

10  game warden, who happened to be in the store, agreed to give Petrocelli a ride, took him out to look

11  for the motorcycle he said he wrecked, and then gave him a ride to Sparks.  *See id.*  In Sparks,

12  Petrocelli got into a taxi, and was driven to Reno, where he paid the taxi fare from a thick wad of

13  cash.  *See* Testimony of Rodney Wilson, Exhibit N, pp. 122-133 (ECF No. 73, pp. 126-37).  The

14  next day, the Volkswagen pickup truck was found near Pyramid Lake, not far from where Petrocelli

15  had been walking the night before.  *See* Testimony of Stanley Williams, Exhibit M, pp. 89-101 (ECF

16  No. 72-1, pp. 80-92).  There were bloodstains in the truck.  *See id.*; *see also* Testimony of Richard

17  Ross, Exhibit M, pp. 101-29 (ECF No. 72-1, pp. 92-120); Testimony of Harold A. Hazard, Exhibit

18  N, pp. 16-63, 67 (ECF No. 73, pp. 20-67, 71).  There were bullet holes in the roof, the passenger

19  side above the door, and the windshield, and there were .22 caliber bullet casings in the truck.

20  *See* Testimony of Richard Ross, Exhibit M, pp. 101-29 (ECF No. 72-1, pp. 92-120); Testimony of

21  Harold A. Hazard, Exhibit N, pp. 16-63, 67 (ECF No. 73, pp. 20-67, 71).  Wilson's body was found

22  nearby, in a rocky crevice, covered with rocks and sagebrush.  *See* Testimony of Richard Ross,

23  Exhibit M, pp. 101-29 (ECF No. 72-1, pp. 92-120); Testimony of Waldemar Eklof III, Exhibit M,

24  pp. 130-39 (ECF No. 72-1, pp. 121-30); Testimony of Vernon McCarty, Exhibit M, pp. 144-55

25  (ECF No. 72-1, pp. 135-46), and Exhibit N, pp. 1-10 (ECF No. 73, pp. 5-14).  There was blood

26  around one of Wilson's front pockets; Wilson's back pockets were turned slightly inside out, and

1   were empty, and his wallet was missing.  *See* Testimony of Vernon McCarty, Exhibit M, pp. 144-55

2   (ECF No. 72-1, pp. 135-46), and Exhibit N, pp. 1-10 (ECF No. 73, pp. 5-14).  Wilson had been shot

3   three times: once in the neck, once in the heart, and once in the back of the head from a distance of

4   two to three inches.  *See id*.

5       Petrocelli testified that he killed Wilson with his own .22 caliber pistol.  *See* Testimony of

6   Tracy Petrocelli, Exhibit P, pp. 38-40 (ECF No. 73-1, pp. 99-101), pp. 69-70 (ECF No. 73-1, pp.

7   130-31), p. 89 (ECF No. 73-1, p. 150); *see also* Exhibit P, p. 11 (ECF No. 73-1, p. 72) (admission in

8   Petrocelli's opening statement that it was Petrocelli's gun that was used to kill Wilson: "He has a

9   gun on him and he takes it out, and ....").  Petrocelli claimed that he did not mean to kill Wilson –

10   that he did so by accident in the course of a dispute and struggle – but Petrocelli never contested that

11   he shot Wilson, and that he did so with his own .22 pistol.  In light of the evidence at trial, especially

12   Petrocelli's own testimony, the admission of the murder weapon into evidence was unnecessary to

13   the proof of Petrocelli's guilt.

14       Petrocelli also testified that in October 1981 he killed his girlfriend, Melanie Barber, with the

15   same .22 pistol.  *See* Testimony of Tracy Petrocelli, Exhibit P, p. 95 (ECF No. 73-1, p. 156).

16   Admission of the pistol into evidence was not necessary to this testimony.  In light of Petrocelli's

17   testimony that he killed Barber and Wilson with the same gun, the admission of the gun into

18   evidence did not contribute anything to the prosecution's showing of the similarities of the two

19   killings.

20       Therefore, even assuming that the discovery of the handgun was improper, and assuming

21   counsel's performance, in failing to object to its admission into evidence, was unreasonable, there

22   was no violation of Petrocelli's constitutional right to effective assistance of counsel, because there

23   is no reasonable probability that, but for the admission of the handgun into evidence, the result of the

24   trial would have been different.  Petrocelli was not prejudiced by his attorney's failure to object to

25   the admission of the handgun into evidence.  The court will deny Petrocelli relief on Ground 6(c).

26

1       <u>Grounds 6(d) and 13</u>

2       In Ground 6(d), Petrocelli claims that his constitutional rights were violated "due to the

3  failure of trial counsel to provide reasonably effective assistance at the guilt/innocence phase of his

4  trial," "for failing to object to the testimony of Melvin Powell." Fourth Amended Petition, pp. 144,

5  160. Petrocelli claims that, after his arrest on April 19, 1982, he was interviewed by detectives at

6  the Las Vegas police department, and, in the course of that interview, the detectives violated his

7  rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Id.* at 160-63. He claims, in turn, that the

8  April 19, 1982, interview led investigators to Melvin Powell, and, therefore, his trial counsel should

9  have objected to Powell's testimony. *Id.* at 163. In Ground 13, Petrocelli claims that his Fifth and

10 Sixth Amendment rights were violated as a result of the post-arrest interrogations. Fourth Amended

11 Petition, p. 248.

12      The Nevada Supreme Court ruled as follows:

13          Looking at the transcript of Petrocelli's interrogation, it is arguable whether
        he did indeed request counsel or whether he waived the right to have counsel present.
14      However, even if the failure to object to the admission of Petrocelli's statements was
        ineffective on the part of trial counsel, the requisite prejudice is not present.
15      Petrocelli testified at trial and admitted killing both the victim in this case and his
        girlfriend in Washington. It is therefore highly unlikely that the outcome of
16      Petrocelli's trial would have been different had Melvin Powell not testified.

17 Exhibit ZZ, pp. 6-7 (ECF No. 36-1, pp. 111-12).

18      Petrocelli raised these claims as Grounds 18, 19, 20, and 22 in his first amended habeas

19 petition in this action. See First Amended Petition (ECF No. 28), pp. 16-19. This court dismissed

20 these claims on procedural grounds. The court of appeals reversed that ruling, and remanded these

21 claims for a determination either on other procedural grounds or on the merits. *See Petrocelli v.*

22 *Angelone*, 248 F.3d 877, 887-88 (9th Cir. 2001).

23      Petrocelli acknowledges that "[b]efore the interview he was advised of his *Miranda* rights

24 and signed a statement that he understood them." Fourth Amended Petition, p. 160. In addition, at

25 the beginning of the statement, Petrocelli was read his *Miranda* rights, and he stated that he

26 understood them. Exhibit J-1, "State's Exhibit PPPP," pp. 2-3 (ECF No. 71-1, pp. 19-20).

However, Petrocelli claims that his *Miranda* rights were violated because the interview was not terminated when the following exchange occurred:

> A [Petrocelli]:    What I want to know is what's, you know.  The only thing ... see ... I don't know if you could even answer my question.  But ... I'd like to sort of know ... I mean ... you know.  You'll get what you want, you know.  I'm just saying that I'd like to know what ... ah ... I mean because they got this other thing in Washington.
>
> Q [detective]:    Um hum.
>
> A.:    And I'd sort of like to know what my ... lawyer wants me to do and ... or what I should do or ... you know.
>
> Q:    Um hum.
>
> A:    I mean ... That's the only thing I just don't know.  That's all.  You know ... I mean ah ....
>
> Q:    Well I ... I explained your rights to you ....
>
> A:    Um hum.
>
> Q:    ... and you understood your rights?
>
> A:    Um hum.
>
> Q:    Is that correct?
>
> A:    Um hum.
>
> Q:    ... What I don't understand is ah ... how when you indicated you knew why we were down here and wanting to talk to you ....
>
> A:    I told the police ... like I said ... I said, "I'd sign anything you want.  You write it out the way you want it and I'd sign it."
>
> Q:    Why?
>
> A:    ... Because, you know, it's ah ... I mean that's what you want.
>
> Q:    Well, all we want's the truth, Tracy.  I don't want anything that's not there.
>
> A:    But ah ... I just ... and that's the only thing I didn't know, you know, was how I ... you know ... I don't know a lot about the law, you know.  But I mean ....
>
> Q:    I mean ....
>
> A:    You write it out and I'll sign it.

13

1    Q: Well, we don't do things like that.  You know ... what we're talking to
2 you about ... was ah ... this murder up here.  You indicated that you wanted to talk to
 us.  Ah ... if you didn't feel like talking or if you don't want to talk, contrary to
3 popular belief, we don't hold anybody down and make 'em talk to us.

4    A: ... I had in mind.  I mean I'm telling you the truth,  I ... like I told the
 policeman I says ... "Whatever you fill out, I'll sign it."

5               *  *  *

6    A: Well, who's going to want me first?  You know, Wash ....

7    Q: (Interrupts)  We do.  You're in custody with us.

8    A: Um hum....  See, I just ... I even have a ... part-time attorney and just to
 answer questions for me.

9
     Q: Is it ... what you're telling me is you don't want to answer any
10 questions without an attorney?

11    A: No.  I just need to have something answered.  That's all.

12    Q: Well, we don't have an attorney ... present with us right now.  Like I
 indicated before if at any time you don't want to ... answer any questions or make any
13 statements you don't have to.  See, this is something that you're doing ah ... totally
 voluntarily.  Okay, we're not forcing you into ah ... doing anything.  It's up to you.  I
14 think it could do ... nothing but help you.  Okay?  I don't know if you need any kind
 of help.  I don't know if you've ever had any kind of help.  But we need to find out ...
15 exactly what happened out there.  I mean I ... I don't know what kind of struggle
 there was in the car.  I don't know what prompted this ... action.  I mean, I wasn't
16 there.  I don't know exactly ... what happened.  I know pretty close, I but I don't
 know exactly....  Would you feel more comfortable if we got a stenographer to write a
17 statement down for you to sign it?

18    A: ... If you'd ... a signed statement saying whatever you want, right?
 Isn't that sufficient?

19
     Q: No sir, it isn't.
20

21 Exhibit J-1, "State's Exhibit PPPP," pp. 12-13, 16-17 (ECF No. 71-1, pp.29-30, 33-34).

22    Later in the interview, Petrocelli told the investigators that he had stolen cars from

23 automobile dealers by taking them for test drives, and he described how he stole a vehicle in that

24 manner from a dealership in Oklahoma City called "Dub Peterson."  *Id*. at pp. 20, 22-26  (ECF No.

25 71-1, pp. 37, 39-43).  Petrocelli claims this led the investigators to Melvin Powell, who testified

26

1    about Petrocelli's Oklahoma City robbery.  Fourth Amended Petition, p. 163; *see* Exhibit O, pp. 49-

2    61 (ECF No. 73-1, pp. 18-30) (testimony of Melvin Powell).

3         At Petrocelli's trial, Powell testified that he worked as a car salesman at Dub Richardson

4    Ford, in Oklahoma City.  Exhibit O, p. 50, (ECF No. 73-1, p. 19).  He testified that in the days

5    before February 10, 1982, Petrocelli approached him and expressed interest in a 1981 Datsun 280ZX

6    automobile.  *Id*. at 50-52 (ECF No. 73-1, pp. 19-21).  Petrocelli spoke with Powell on three or four

7    occasions, and took two test drives in the 280ZX.  *Id*. at 52.  According to Powell, Petrocelli came

8    into the dealership to take the second test drive on February 10, 1982.  *Id*. at 53 (ECF No. 73-1, p.

9    22).  Powell testified that, during the second test drive, when he suggested that Petrocelli turn the car

10   around and go back to see if they could make a deal, Petrocelli did not answer and continued

11   driving, heading out of town.  *Id*. at 55 (ECF No. 73-1, p. 24).  Powell testified that he then asked

12   Petrocelli what he was doing, and said, "Let's turn around and go back, and, you know, do some

13   business."  *Id*. at 56 (ECF No. 73-1, p. 25).  According to Powell, Petrocelli looked over at him and

14   said, "I don't want to hurt you, but I'm going to take your car."  *Id*.  Powell testified that he

15   responded that he didn't care if Petrocelli took the car, and asked to be let out.  *Id*.  He testified that

16   Petrocelli told him that he would have to take him out to where it would take him quite a while to

17   walk back.  *Id*.  Powell testified that he was afraid of Petrocelli, and did not resist.  *Id*.  Petrocelli

18   took Powell about twenty miles out of town.  *Id*.  On the way, according to Powell's testimony,

19   Petrocelli asked Powell if he had any money, and Powell said he had two or three dollars.  *Id.* at 56-

20   57 (ECF No. 73-1, pp. 25-26).  Powell testified that Petrocelli told Powell to give him that money,

21   but let him keep some change to use a telephone.  *Id*. at 57.  Powell testified that Petrocelli then let

22   him out of the car.  *Id*.  Powell testified that he never saw the car again.  *Id*.  On cross-examination,

23   Powell testified that Petrocelli called him the next day.  *Id*. at 59 (ECF No. 73-1, p. 28).  On redirect

24   examination, Powell testified that, in the course of that call the next day, Petrocelli asked if he was

25   okay, and told him he was leaving the car at a location near Erick, Oklahoma.  *Id*. at 60 (ECF No.

26   73-1, p. 29).  However, Powell testified that the car was never recovered.  *Id*.

A suspect subject to custodial interrogation has a Fifth and Fourteenth Amendment right to consult with an attorney and to have an attorney present during questioning, and the police must explain this right to the suspect before questioning. *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966). When an accused invokes his right to have counsel present during custodial interrogation, he may not be subjected to further questioning until counsel has been made available or the suspect himself reinitiates conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). This "prophylactic rule [is] designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

In *Davis v. United States*, 512 U.S. 452 (1994), the Supreme Court declined to extend the rule of *Edwards* to situations in which the suspect makes a vague or ambiguous reference to an attorney after previously waiving his *Miranda* rights. *Davis*, 512 U.S. at 459. The suspect in *Davis* explicitly waived his right to counsel, both orally and in writing, before the interrogation began; then, later, during the questioning, he said, "Maybe I should talk to a lawyer." *Id*. at 454-55. The Court held that, under the circumstances, that was not an unambiguous invocation of the right to counsel, and the questioning did not have to stop:

> The applicability of the "'rigid' prophylactic rule" of *Edwards* requires courts to "determine whether the accused *actually invoked* his right to counsel." *Smith v. Illinois*, [469 U.S. 91, 95 (1984)] (emphasis added), quoting *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. *See Connecticut v. Barrett*, [479 U.S. 523, 529 (1987)]. Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, [501 U.S. 171, 178 (1991)]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. *See ibid.* ("[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards*"); *Edwards v. Arizona*, supra, 451 U.S., at 485, 101 S.Ct., at 1885 (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly* asserted his right to counsel") (emphasis added).
>
> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S., at 97-98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," post, at 2364 [at 512 U.S. 476] (SOUTER, J., concurring in judgment),

16

1     he must articulate his desire to have counsel present sufficiently clearly that a
2     reasonable police officer in the circumstances would understand the statement to be a
request for an attorney. If the statement fails to meet the requisite level of clarity,
3     *Edwards* does not require that the officers stop questioning the suspect.  *See Moran v.*
*Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986)
4     ("[T]he interrogation must cease until an attorney is present only [i]f the individual
states that he wants an attorney") (citations and internal quotation marks omitted).

5  *Davis*, 512 U.S. at 458-59.

6        In this case, as in *Davis*, before the April 19, 1982, interrogation began, Petrocelli was

7  informed of, and waived, his *Miranda* rights, both orally and in writing.  *See* Exhibit J-1, "State's

8  Exhibit PPPP," pp. 2-3 (ECF No. 71-1, pp. 19-20); *see also* Fourth Amended Petition, p. 160

9  ("Before the interview he was advised of his *Miranda* rights and signed a statement that he

10  understood them.").

11        Thereafter, during the questioning, Petrocelli made comments to the effect that he had

12  questions he would "sort of" like to ask an attorney:

13       -     "I'd sort of like to know what my ... lawyer wants me to do and ... or what I
should do or ... you know."

14
15       -     "I mean ... That's the only thing I just don't know.  That's all.  You know ... I
mean ah ...."

16       -     "But ah ... I just ... and that's the only thing I didn't know, you know, was
how I ... you know ... I don't know a lot about the law, you know.  But I mean
17                 ...."

18       -     "See, I just ... I even have a ... part-time attorney and just to answer questions
for me."

19

20  Exhibit J-1, "State's Exhibit PPPP," pp. 12-13, 16-17 (ECF No. 71-1, pp.29-30, 33-34).  Petrocelli

21  never said that he wished to have counsel present for the questioning, and Petrocelli never said that

22  he wished not to answer further questions before consulting a lawyer or without a lawyer present.

23  Petrocelli did not make an unambiguous request for counsel.

24        Apparently seeking clarification, the investigator asked:  "Is it ... what you're telling me is

25  you don't want to answer any questions without an attorney?"  And, Petrocelli answered: "*No*.  I just

26  need to have something answered.  That's all."  Exhibit J-1, "State's Exhibit PPPP," p. 16 (ECF No.

71-1, p. 33) (emphasis added).  The investigator then noted that there was not an attorney present, reiterated that "if at any time you don't want to ... answer any questions or make any statements you don't have to," and properly went on with the questioning.  *Id*.

Because Petrocelli did not unambiguously request counsel, under *Davis* there was no requirement that the police discontinue the questioning.  There was no *Miranda* violation, and, therefore, Petrocelli's trial counsel was not ineffective for failing to object to Powell's testimony on the ground that it was the fruit of a *Miranda* violation.

Moreover, this court agrees with the Nevada Supreme Court that, even if, for the sake of analysis, it is assumed that there was a *Miranda* violation on account of the investigators' failure to cease the interrogation after the exchange discussed above, there is no reasonable probability that, but for counsel's failure to object to Powell's testimony on that basis, the result of Petrocelli's trial would have been different.  *See Strickland*, 466 U.S. at 688; *see also id*. at 694.

It is undisputed that Petrocelli killed Wilson, and there was solid evidence, beyond Powell's testimony, that Petrocelli killed him maliciously, intentionally, wilfully, deliberately and with premeditation, and in the course of a robbery.  In light of the evidence, Petrocelli's self-serving and uncorroborated story – that the shooting happened accidentally, during a struggle resulting from a dispute over the price of the truck – was not believable.

There is no controversy about who killed Wilson; Petrocelli testified that he killed Wilson. *See* Testimony of Tracy Petrocelli, Exhibit P, pp. 38-41 (ECF No. 73-1, pp. 99-102).  Petrocelli, however, claimed in his testimony that the killing was an accident – that it happened after he pulled out his gun, in the course of a dispute over the price of the truck he was test driving.  *Id*. at 40.  But the circumstantial evidence belies Petrocelli's version of the events.

The evidence showed that Petrocelli fired six shots, and three of those shots hit Wilson. *See* Testimony of Harold A. Hazard, Exhibit N, pp. 31, 36 (ECF No. 73, pp. 36, 41); Testimony of Vernon McCarty, Exhibit N, p. 2 (ECF No. 73, p. 6).  One of those shots was to the back of Wilson's head from a distance of two to three inches.  *See* testimony of Vernon McCarty, Exhibit N,

1   p. 2 (ECF No. 73, p. 6); Testimony of David Atkinson, Exhibit N, pp. 99-100 (ECF No. 73, pp. 103-

2   04); Testimony of William John Diamond, Exhibit N, pp. 139-43 (ECF No. 73, pp. 143-47).

3          After the shooting, Petrocelli did not report what happened to the police or to anyone else.

4   Instead, he took Wilson's body to a remote area about 30 miles from Reno, near Pyramid Lake, and

5   hid it in a rocky crevasse.  Then, after getting the truck stuck and abandoning it, he lied  about what

6   had happened to the people he encountered on his way back to Reno.  *See* Testimony of Don Dalton,

7   Exhibit M, pp. 80-86 (ECF No. 72-1, pp. 71-77; Testimony of Stanley Williams, Exhibit M, pp. 90-

8   98 (ECF No. 72-1, pp. 81-89); Testimony of Rodney Wilson, Exhibit N, pp. 124-25 (ECF No. 73,

9   pp. 128-29).

10          When Wilson's body was found, his back pockets were turned slightly inside out, and were

11  empty, and his wallet was missing.  *See* Testimony of Vernon McCarty, Exhibit M, pp. 144-55 (ECF

12  No. 72-1, pp. 135-46), and Exhibit N, pp. 1-10 (ECF No. 73, pp. 5-14).  There were blood stains

13  around his front left pocket.  *See* Testimony of William John Diamond, Exhibit N, p. 138 (ECF No.

14  73, p. 142).  Petrocelli admitted that, after he killed Wilson, he took $1300 from his wallet.  *See*

15  Testimony of Tracy Petrocelli, Exhibit P, pp. 46-47 (ECF No. 73-1, pp. 107-08); *see also id*. at p.

16  121 (ECF No. 73-1, p. 182).  Later that night, Petrocelli paid a taxi fare from a thick wad of cash.

17  *See* Testimony of Rodney Wilson, Exhibit N, pp. 124-26 (ECF No. 73, pp. 128-30).

18          In light of the evidence at trial, even excluding Powell's testimony, Petrocelli's claim that the

19  killing of Wilson was accidental was implausible.  There is no reasonable probability that, but for

20  Powell's testimony, the result of Petrocelli's trial would have been different.[8]

21          Other than his *Miranda* argument, Petrocelli makes no colorable argument, and does not

22  suggest that he can make a factual showing, that his statements were given involuntarily, in violation

23  of the Fifth and Fourteenth Amendments.  In considering the voluntariness of a confession, a court

24  _____

25          [8]  Petrocelli points out, in his briefing, that the prosecutor argued at trial that the Powell
    testimony was the only, or the strongest, evidence of Petrocelli's intent to commit robbery. See Exhibit
26  M, pp. 157-63 (ECF No. 72-1, pp. 148-54).  The court is not bound by those arguments of the
    prosecutor.  There is no reasonable probability that the jury would have come to any different
    conclusion in this case without Powell's testimony.

1   "examines whether a defendant's will was overborne by the circumstances surrounding the giving of

2   a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citation and internal quotation

3   marks omitted); *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir.2011).  "The due process test takes into

4   consideration the totality of all the surrounding circumstances -- both the characteristics of the

5   accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (citations and internal

6   quotation marks omitted).   The ultimate question is: "Is the confession the product of an essentially

7   free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26

8   (1973) (citation omitted).  Petrocelli does not articulate any colorable claim that his statements were

9   not voluntary, and he does not tie any such claim to any facts that he could establish.  *See* Fourth

10  Amended Petition, pp. 248-51; Reply, pp. 88-102.  Nor does Petrocelli articulate a colorable claim,

11  or point to any evidence supporting a claim, that there was a violation of his Sixth Amendment right

12  to counsel.  *See id*.

13          The court will deny Petrocelli relief with respect to Grounds 6(d) and 13.

14          Ground 7(b)

15          In Ground 7(b), Petrocelli claims that his constitutional rights were violated "due to the

16   failure of trial counsel to provide reasonably effective assistance at the penalty phase of his trial,"

17  "for failing to properly object to evidence of a prior conviction, allowing the jury to find the

18  aggravating factor of a conviction of a felony involving the use of force."  Fourth Amended Petition,

19  pp. 164, 180.

20          At the penalty phase of the trial, the prosecution sought to prove that two aggravating

21  circumstances existed with respect to Wilson's murder, such that Petrocelli was eligible for the death

22  penalty.  *See* Closing Argument of Prosecution, Exhibit U, pp. 74-84 (ECF No. 75, pp. 77-87).  The

23  aggravating circumstances asserted by the prosecution were that the murder was committed in the

24  course of a robbery (*see* NRS 200.033(4)), and that the murder was committed by a person

25  previously convicted of a felony involving the use or threat of violence (*see* NRS 200.033(2)(b)).

26  *See id*.  With regard to the second of the alleged aggravating circumstances, the prosecution sought

20

to prove that Petrocelli had previously, in Washington, been convicted of a kidnapping involving the use or threat of violence.  *See id*. at 78-81; *see also id*. at 86, 89-90 (defense acknowledged in its closing argument that the prosecution's basis for the alleged NRS 200.033(2) aggravating circumstance was the Washington kidnapping conviction).  Beyond Petrocelli's own admission that he had been convicted of felony kidnapping in Washington, the prosecution introduced the testimony of two witnesses, Maureen Lawler and Joan Bleeker, to prove that the kidnapping involved the use or threat of violence.  *See* Testimony of Maureen Lawler, Exhibit U, pp. 35-45 (ECF No. 75, pp. 38-48); Testimony of Joan Bleeker, Exhibit U, pp. 47-60 (ECF No. 75, pp. 50-63); *see also* Testimony of Tracy Petrocelli, Exhibit R, p. 18 (ECF No. 74, p. 165) (admitting that he had been previously convicted of felony kidnapping).  The jury found both aggravating circumstances alleged by the prosecution to exist.  *See* Exhibit U, p. 98 (ECF No. 75, p. 101).

Petrocelli claims that his trial counsel was ineffective for "failing to properly object to evidence of a prior conviction, allowing the jury to find the aggravating circumstance of a conviction of a felony involving the use of force."  *See* Fourth Amended Petition, p. 180.  It appears to be Petrocelli's position that the prosecution's proof of the prior felony aggravator was improper because the conviction was of a degree of kidnapping that in Washington does not necessarily involve use or threat of violence, and Petrocelli's counsel should have objected to the prosecution's introduction of extrinsic evidence to show that the kidnapping did, in fact, involve the use or threat of violence.

Petrocelli made this same claim in Ground 12 of his first amended habeas petition in this action.  *See* First Amended Petition (ECF No. 28), p. 13.  That claim was denied by this court in the order entered September 29, 1997.  *See* Order entered September 29, 1997 (ECF No. 78), p. 18.  The court of appeals affirmed that ruling.  *Petrocelli v. Angelone*, 248 F.3d 877, 889-92 (9th Cir. 2001).  To the extent that the claim made in Ground 7(b) of Petrocelli's fourth amended petition is the same as the claim made in Ground 12 of his first amended petition -- that is, to the extent that the claim in Ground 7(b) focuses on counsel's failure to object to evidence regarding the Washington kidnapping

21

1   -- it is foreclosed by the doctrine of law of the case.  "Under the law of the case doctrine, a court is

2   generally precluded from reconsidering an issue that has already been decided by the same court, or

3   a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997).

4   "The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion." *Id*.  "A

5   court may have discretion to depart from the law of the case where:  (1) the first decision was clearly

6   erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is

7   substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would

8   otherwise result." *Id*.  "Failure to apply the doctrine of the law of the case absent one of the

9   requisite conditions constitutes an abuse of discretion."  *Id*.  Therefore, as this claim has been fully

10  adjudicated, the law of the case doctrine applies, and it precludes reconsideration of this claim.

11         There is another facet of Ground 7(b), however, as it is presented in Petrocelli's fourth

12  amended petition.  Petrocelli includes, in his statement of facts in support of Ground 7(b), a

13  discussion of his trial counsel's advice regarding his decision to testify at the guilt phase of his trial,

14  and the effect his decision to testify had on the admission of evidence regarding the killing of

15  Melanie Barber.  *See* Fourth Amended Petition, pp. 180-82.  The court, though, sees no connection

16  between those matters and the admission of the testimony of Lawler and Bleeker at the penalty

17  phase of the trial to establish the nature of Petrocelli's prior kidnapping conviction.  Furthermore,

18  the admission of evidence regarding the killing of Melanie Barber had no impact on the aggravating

19  circumstances found by the jury; at the time of Petrocelli's trial in Nevada, he had not been

20  convicted of murder for the Barber homicide, and that killing was not used as an aggravating

21  circumstance.  Moreover, Petrocelli's complaint about his counsel's advice regarding his decision to

22  testify is separately set forth in Petrocelli's fourth amended habeas petition as Ground 6(b), and that

23  claim has been dismissed.  *See* Order entered March 23, 2010 (ECF No. 200), pp. 11-12 (dismissing

24  Ground 6(b) on the basis that the claim was raised in Petrocelli's first amended petition, denied by

25  this court, and then abandoned by Petrocelli on appeal).

26

1    In short, whether Ground 7(b) is construed as a claim regarding Petrocelli's counsel's failure

2    to object to evidence concerning the Washington kidnapping conviction, or as a claim regarding

3    counsel's advice regarding Petrocelli's decision to testify at trial, or as both, the claim is not

4    procedurally viable.  The court will deny Petrocelli habeas corpus relief with respect to Ground 7(b).

5    Ground 7(f)

6    In Ground 7(f), Petrocelli claims:

7    Even if no single instance of ineffectiveness at either phase of the trial rises
     to the level of prejudice requiring a new trial, under the *Strickland* standards,

8    ineffectiveness must be assessed in terms of the cumulative impact of all instances
     of deficient performance and prejudice.

9

10   Fourth Amended Petition, p. 186.  Petrocelli incorporates in Ground 7f the facts and arguments he

11   sets forth in all of Grounds 6 and 7.  *Id*.

12   Two of Petrocelli's claims of ineffective assistance of counsel are pertinent to this

13   cumulative error claim:  the claims in Grounds 6(c) and 6(d).  As is discussed above, with respect to

14   Ground 6(c), the court assumes, for the purpose of this order, that Petrocelli's counsel acted

15   unreasonably in not challenging the admission of the handgun into evidence at the guilt phase of his

16   trial, but the court concludes that Petrocelli was not prejudiced by that evidence.  As is also

17   discussed above, with respect to Ground 6(d), the court finds that Petrocelli's *Miranda* rights were

18   not violated in the April 19, 1982 interview, and, in addition and alternatively, the court finds that

19   Petrocelli was not prejudiced by the testimony of Melvin Powell, which allegedly stemmed from the

20   April 19, 1982, interview.

21   As is discussed above, the court sees no way that the admission of the handgun into evidence

22   prejudiced Petrocelli – that evidence had no bearing on any contested factual issue in the case.

23   *See* discussion, *supra*, pp. 8-11.  That remains the conclusion of the court when the attorney error

24   identified in Ground 6(c) is considered together with the attorney error considered in the alternative

25   in Ground 6(d).  There is no synergy between the handgun evidence and the Powell testimony; the

26   two were unrelated.  Because there was no conceivable prejudice to Petrocelli from the admission of

23

1   the handgun into evidence, and because the handgun evidence and the Powell testimony were

2   wholly unrelated and without any evidentiary synergy, the cumulative error analysis is no different

3   from the prejudice analysis of the attorney error considered in the alternative in Ground 6(d).

4   *See* discussion, *supra*, pp. 18-19.

5        The court finds, therefore, that, even if it is assumed that Petrocelli's *Miranda* rights were

6   violated in the April 19, 1982, interview, as asserted by Petrocelli in Ground 6(d), and even if that

7   error is considered together with the attorney error assumed for purposes of the analysis of

8   Ground 6(c), there is no reasonable probability that, but for counsel's errors, the result of Petrocelli's

9   trial would have been different.  *See Strickland*, 466 U.S. at 688, 694.  The alleged attorney errors

10  under consideration here did not have a substantial and injurious effect or influence on the jury's

11  verdict, and did not so infect the trial with unfairness as to make the resulting conviction a denial of

12  due process.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *Donnelly v. DeChristoforo*,

13  416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03 (1973); *Parle v.*

14  *Runnels,* 505 F.3d 922, 926-27 (9th Cir.2007).

15       The court will deny Petrocelli habeas corpus relief with respect to Ground 7(f).

16       <u>Ground 10</u>

17       In Ground 10, Petrocelli claims that "the statutorily-mandated reasonable doubt instruction

18  unconstitutionally minimized the state's burden of proof and infected the trial and sentencing

19  process."  Fourth Amended Petition, p. 197.

20       At Petrocelli's trial, the court instructed the jury as follows with regard to the definition of

21  "reasonable doubt":

22            A reasonable doubt is one based on reason.  It is not mere possible doubt, but
        is such a doubt as would govern or control a person in the more weighty affairs of
23      life.  If the minds of the jurors, after the entire comparison and consideration of all
        the evidence, are in such a condition that they can say they feel an abiding conviction
24      of the truth of the charge, there is not a reasonable doubt.  Doubt, to be reasonable,
        must be actual and substantial, not mere possibility or speculation.

25

26

1    *See* Exhibit D, Instruction No. 12 (ECF No. 70, p. 129).[9]  Citing *Cage v. Louisiana*, 498 U.S. 39

2    (1990), Petrocelli argues that "this definition of 'reasonable doubt' creates a standard of proof which

3    is below the standard of proof required by the constitution for the State to secure a conviction."

4    Fourth Amended Petition, p. 197.  Petrocelli focuses his argument upon the second sentence – "It is

5    not mere possible doubt but is such a doubt as would govern or control a person in the more weighty

6    affairs of life" -- and on the last sentence – "Doubt to be reasonable, must be actual and substantial,

7    not mere possibility or speculation."  *Id*. at 197-98.

8          Petrocelli presented this claim to the Nevada Supreme Court on the appeal in his second state

9    habeas action.  *See* Exhibit WW, pp. 32-33.  The Nevada Supreme Court ruled as follows:

10              ... [Petrocelli] contends that the statutory definition of reasonable doubt contained in
                the jury instructions given at his trial violated his right to due process.  He maintains
11              that the language of the Nevada instruction is similar to a Louisiana instruction,
                language that was later declared unconstitutional by the United States Supreme Court
12              in *Cage v. Louisiana*, 498 U.S. 39 (1990).  However, this court has held that the same
                reasonable doubt standard used in Petrocelli's trial does not violate due process.
13              *Lord v. State*, 107 Nev. 28, 806 P.2d 548 (1991).  In light of our holding in *Lord*,
                Petrocelli's argument is meritless.

14

15   Order Dismissing Appeal, Exhibit ZZ, p. 7.

16         Respondents argue that this same claim was made as Ground 1 of Petrocelli's first amended

17   petition in this case, that the claim was denied in this court's September 30, 1997, order, and that the

18   court of appeals affirmed that ruling on appeal.  *See* Answer, p. 61.  Respondents argue that,

19   therefore, the claim has been fully adjudicated and is barred by the law of the case doctrine.  *Id*.

20   However, this claim is not the same as the claim in Ground 1 of the first amended petition.  Ground

21   1 of the first amended petition concerned comments regarding the reasonable doubt standard made

22   by the trial judge during jury voir dire.  *See* First Amended Petition (ECF No. 28), p. 8.  That is not

23   the claim at issue here.

24         This claim, Ground 10 of the fourth amended petition, is much the same as Ground 25 of the

25   first amended petition.  *See id*. at 20.  Ground 25 of the first amended petition was one of the claims

26   _____

            [9]  Between 1967 and 1991, this definition of reasonable doubt was codified at NRS 175.211.

                                          25

1  remanded to this court from the court of appeals for further consideration.  *See Petrocelli v.*

2  *Angelone*, 248 F.3d 877, 887-88 (9th Cir. 2001).  Ground 10 is now properly before this court with

3  respect to its merits.

4      The claim in Ground 10 fails on its merits, however.  The Ninth Circuit Court of Appeals has

5  held this same Nevada jury instruction constitutional, both before and after *Cage* was decided by the

6  Supreme Court.  *See Ramirez v. Hatcher*, 136 F.3d 1209, 1214 (9th Cir.), *cert. denied*, 525 U.S. 967

7  (1998); *Darnell v. Swinney*, 823 F.2d 299, 302 (9th Cir.1987), *cert. denied*, 484 U.S. 1059 (1988).

8  Also, more recently, in a capital case subject to AEDPA standards, the Ninth Circuit Court of

9  Appeals ruled that the law of this circuit forecloses a claim such as this, and held the issue to be

10  unworthy of a certificate of appealability.  *See Nevius v. McDaniel*, 218 F.3d 940, 945 (9th

11  Cir.2000).  In view of *Ramirez*, *Darnell*, and *Nevius*, the court concludes that Ground 10 is without

12  merit.  The court will deny Petrocelli habeas corpus relief with respect to Ground 10.

13      Ground 12

14      In Ground 12, Petrocelli claims that his rights under the Fifth and Sixth Amendments were

15  violated due to "the admission of testimony from Dr. Gerow, who presented psychiatric testimony

16  against the defendant based on communications made by the defendant during a court-ordered

17  psychiatric examination."  Fourth Amended Petition, pp. 220, 238; *see also*, *generally*, *id*. at 220-47.

18  In Ground 12, Petrocelli also claims that it was ineffective assistance of counsel for his appellate

19  counsel and his state post-conviction counsel to fail to claim violations of his Fifth and Sixth

20  Amendment rights, as well as the psychotherapist-patient privilege, on his direct appeal and in his

21  first and second state habeas actions.  *Id*. at 238-44.

22      Petrocelli asserted a similar claim, without the ineffective assistance of counsel claims, in his

23  first amended petition in this action as Ground 26.  *See* First Amended Petition (ECF No. 28), p. 20.

24  This court dismissed that claim on procedural grounds.  The court of appeals reversed that ruling,

25  and remanded the claim for a determination either on other procedural grounds or on the merits.  *See*

26  *Petrocelli v. Angelone*, 248 F.3d 877, 887 (9th Cir. 2001).

1    Petrocelli then asserted this claim in state court in his third state habeas action.  Exhibit 26

2  (ECF No. 165, pp. 2-43).  Petrocelli later filed a supplement to that petition.  Exhibit 32 (ECF No.

3  165-3, pp. 80-93).  The state district court held evidentiary hearings.  Exhibits 29, 30, 31 (ECF No.

4  165-2, and ECF No. 165-3, pp. 2-78) (transcripts).  The state district court "denied and dismissed"

5  the petition on April 14, 2006, rejecting this claim on its merits.  Exhibit 36 (ECF No. 166, pp.

6  30-40).  Petrocelli appealed, raising this claim before the Nevada Supreme Court.  *See* Exhibit 38

7  (ECF Nos. 166-2, 166-3) (opening brief); Exhibit 39 (ECF No. 166-4) (answering brief); Exhibit 40

8  (ECF Nos. 166-5, 167) (reply brief).  The Nevada Supreme Court affirmed on July 26, 2007.

9  Exhibit 41 (ECF No. 167-2, pp. 2-15 ).  The Nevada Supreme Court addressed the merits of this

10  claim as follows:

11         Petrocelli next contends that even if reweighing is permissible, our analysis
    should exclude consideration of Dr. Lynn Gerow's testimony during the penalty
12  hearing as it violated doctor-patient privilege [footnote omitted] and his Fifth
    Amendment right to remain silent.  Even assuming this testimony was improperly
13  admitted, however, it has had no impact on our reweighing or harmless error analysis.
    At the penalty hearing, after Petrocelli testified on his own behalf and the defense
14  introduced reports from psychiatrist Dr. John Chappel and psychologist Dr. Martin
    Gutride, Dr. Gerow testified during the State's rebuttal case.  Dr. Gerow testified that
15  persons suffering from psychopathic personality, like Petrocelli, and who have a
    history of violence tend to repeat violent acts and thus the propensity for further
16  violence is high.  Both Dr. Chappel and Dr. Gutride diagnosed Petrocelli with
    antisocial personality disorder and described him as dangerous to others.
17  Dr. Chappel offered a more positive prognosis than Dr. Gerow in terms of
    Petrocelli's response to treatment, concluding that treatment might prevent any
18  further homicidal outbursts of rage.  Dr. Gutride, however, was less optimistic than
    Dr. Chappel, concluding that Petrocelli's ability to profit from mental health
19  treatment was questionable in light of the depth of his mistrust of others.  Dr. Gerow
    testified that he had not reviewed Dr. Gutride's report but agreed with Dr. Chappel's
20  diagnosis.  [Footnote:  We also cannot ignore that the jury heard other compelling
    evidence of Petrocelli's violent propensities during the guilt phase of his trial when
21  the State presented evidence that he had killed his girlfriend five months before
    Wilson's murder.  Although this evidence could not have been alleged at that time as
22  an aggravating circumstance (because he had not yet been formally convicted of the
    girlfriend's murder), the jury could have properly considered it in exercising its
23  discretion to impose a death sentence *after* it had determined that Petrocelli was death
    eligible, *i.e.,* [that] no mitigating circumstances were sufficient to outweigh one or
24  more aggravating circumstances.]  Accordingly, because Dr. Gerow's testimony was
    essentially cumulative, we conclude that any error in admitting Dr. Gerow's
25  testimony did not unduly prejudice Petrocelli.

26

1    Order of Affirmance, Exhibit 41, pp. 7-8 (ECF No. 167-2, pp. 8-9) (emphasis in original); *see also*

2    *id*. at 13 (ECF No. 167-2, p. 14) ("And, as we explained above, Petrocelli failed to show that the

3    admission of Dr. Gerow's testimony unduly prejudiced him in light of other compelling evidence

4    demonstrating his future dangerousness.").

5         First, the court finds no merit in Petrocelli's claim to the extent it is based on his assertion

6    that his counsel in his first and second state habeas actions were ineffective.  *See* 28 U.S.C.

7    § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-

8    conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.).

9         Turning to Petrocelli's claims that Dr. Gerow's testimony violated his rights under the Fifth

10   and Sixth Amendments, this court agrees with the Nevada courts that, assuming Dr. Gerow's

11   testimony should have been excluded, Petrocelli was not prejudiced.  Petrocelli argues that

12   Dr. Gerow's testimony "was the cornerstone of the prosecution's argument of 'future

13   dangerousness' which in turn was the cornerstone of their argument for the death penalty."  Fourth

14   Amended Petition, pp. 220.  There was, however, a great deal of evidence, aside from Dr. Gerow's

15   testimony, indicating that Petrocelli was dangerous and not susceptible to treatment.

16        First, the jury saw the evidence regarding Petrocelli's killing of Wilson, and Petrocelli's

17   behavior immediately following that killing.  Petrocelli did not report the shooting, and he did not

18   get help for Wilson; rather, Petrocelli drove some 30 miles out of Reno to a remote area near

19   Pyramid Lake and buried Wilson's body in a rock pile.  Petrocelli then lied to the people he came

20   into contact with about what he was doing at Pyramid Lake.  Moreover, in the penalty phase of the

21   trial, the jury heard Petrocelli's cold demeanor with respect to the killing in a recorded interview

22   with the police.  *See* Exhibit U, pp. 46-47  (ECF No. 75, pp. 49-50).

23        The jury also heard an eyewitness, Lloyd Maloney, describe in detail Petrocelli's killing of

24   his girlfriend, 18-year-old Melanie Barker, less than six months before he killed Wilson. *See*

25   Testimony of Lloyd Maloney, Exhibit R, pp. 54-62 (ECF No. 74-1, pp. 5-13).  Maloney's

26   description of Petrocelli's killing of Barker included the following:

28

1      Q:      What happened then?

2      A:      He was dragging her backward out of the place.  They started up the
3  hallway.

       About that time the lady that I was sitting with, I shoved her around the
4  corner, and as I looked down the hallway again, she was beginning to fall for some
   reason.  I don't know.  Maybe he had hit her.
5
       Q:      Without speculating.  Just describe what you saw.
6
       A:      As she was going toward the floor, he was saying, "If you keep
7  screaming I will shoot you."

8      She didn't stop screaming.  So, as she was going down he fired the weapon
   once.  It hit her in the leg.  As she landed on the floor, he was turning.
9
       The weapon went off again, and the third time he had both hands on the gun,
10 pointed directly at her head and fired the shot.

11 *Id*. at 56.

12      Furthermore, Maureen Lawler, Melanie Barker's mother, testified in the penalty phase of

13 Petrocelli's trial about Petrocelli's kidnapping of Barker about six months before he killed her, and

14 about a year before he killed Wilson.  Exhibit U, pp. 35-45  (ECF No. 75, pp. 38-48).  Lawler

15 testified that one night Barker did not return from her work as a waitress, and was missing for three

16 days.  *Id.* at 38-39 (ECF No. 75, pp. 41-42).  She testified that when Barker reappeared, she had

17 been "beaten on the face" and she was "hysterical."  *Id.* at 39-40 (ECF No. 75, pp. 42-43); *see also*

18 Testimony of Joan Bleeker, Exhibit U, pp. 47-48  (ECF No. 75, pp. 50-51) (When Bleeker

19 encountered Barker, in a restroom at a gas station, Barker said "she was being kidnapped," "was

20 scared," and "was getting knocked around," and she asked Bleeker to get Petrocelli's license plate

21 number and call the police.); *see also* Testimony of Tracy Petrocelli, Exhibit U, p. 54 (ECF No. 75,

22 p. 57) (admitting that he hit Barker).  Lawler testified that Barker told her that Petrocelli had

23 kidnapped her at gunpoint.  Exhibit U, p. 40  (ECF No. 75, p. 43).  Lawler testified that Barker told

24 her that during the kidnapping Petrocelli told her that "they would be picked up by a friend bringing

25 a seaplane on the river ... [a]nd some of his friends would do away with her."  *Id*.  Lawler also

26 testified that in a telephone conversation with Petrocelli, prior to the kidnapping of Barker, they had

29

a dispute about a wallet and keys that Petrocelli had left in a car, and Petrocelli threatened to "blow [her] away."  *Id*. at 41-42  (ECF No. 75, p. 44-45).

The evidence of Petrocelli's dangerousness also involved Petrocelli's statements and actions after the killing of Wilson.  John J. Lukas was in jail with Petrocelli while Petrocelli was awaiting trial, and he testified in the penalty phase of Petrocelli's trial about conversations he had with Petrocelli in jail.  Exhibit U, pp. 22-35  (ECF No. 75, pp. 25-38).  Lukas testified that Petrocelli wanted him to help with an escape attempt, and threatened him.  *Id*. at 26 (ECF No. 75, p. 29). Moreover, Lukas testified as follows about what Petrocelli planned to do if he escaped:

> Q:  Would you state what Mr. Petrocelli said he was going to do after he got out?
>
> A:  He was going to get rid of the snitch.
>
> Q:  And who was that?
>
> A:  Some girl in Vegas or something that he thought had pissed him off.
>
> Q:  Did he say what he was going to do to her?
>
> A:  Get rid of her.
>
> Q:  Did he say anything else?
>
> A:  That was about it.
>
> Q:  Did he have plans with respect to anyone else, Mr. Lucas?
>
> A:  He said he'd get rid of the DA and all that, you know.

*Id*. at 31 (ECF No. 75, p. 34).

In the defense case in the penalty phase of the trial, Petrocelli introduced the reports of two psychiatrists and a psychologist regarding his mental status.  Those reports spoke to Petrocelli's dangerousness.

Defense Exhibit 3, in the penalty phase of the trial, was a report by John Petrich, M.D., of a psychiatric evaluation of Petrocelli, dated June 19, 1981, written while Petrocelli was in jail in

30

1   Washington awaiting trial on the kidnapping charges.  Exhibit J3, pp. 3-8 (ECF No. 71-2, pp. 53-

2   58).  In the report, Dr. Petrich stated:

3        The defendant's psychiatric diagnosis is that of polydrug abuse with special emphasis
         on amphetamines.  In addition, I strongly suspect that the defendant may have
4        recurrent depressive episodes which are behind his drug abuse.  That is, the drug
         abuse may in fact be an attempt at self-treatment for this recurrent depressive
5        condition.

6   *Id*. at 3 (ECF No. 71-2, p. 53).  Later in the report, under the heading "Diagnosis," Dr. Petrich

7   reported Petrocelli's diagnosis as follows:

8        Polydrug abuse - amphetamines and alcohol.
         Rule out manic depressive illness or cyclothymic personality disorder.
9

10  *Id*. at 6 (ECF No. 71-2, p. 56).  With regard to the likelihood of Petrocelli committing acts of

11  violence in the future, Dr. Petrich's report states:

12       With special reference to violence on the part of the defendant, it appears that he does
         admit, in periods of excitement, of making holes in the wall with his fists and has
13       struck Melanie three times during the course of their highly conflicted relationship.
         He denies other episodes of violence and his history is free of significant criminal
14       behavior.  He states he has never hurt anyone in a fit of violence nor used a weapon.
         He does admit making angry threats toward Melanie because he perceived that she
15       was not understanding nor supportive of him.

16  *Id*. at 5 (ECF No. 71-2, p. 55).  In this regard, the report also states:

17       With reference to the defendant's likelihood to commit further criminal acts or to be
         dangerous to the public, I must state that with control of the mood swings and alcohol
18       and drug rehabilitation, he appears to present a minimal risk to the community.
         However, I must emphasize that he would require an intensive treatment program to
19       achieve these goals.

20  *Id*. at 6 (ECF No. 71-2, p. 56).  Of the three reports introduced into evidence by the defense,

21  Dr. Petrich's report was the most supportive of the defense position that Petrocelli's mental

22  condition might be susceptible to treatment, and that he may not present a danger of violence

23  in the future.  However, there were two obvious factors that undermined the weight of Dr. Petrich's

24  opinions.  First, Dr. Petrich's report was written about three months before Petrocelli killed Barker,

25  and about nine months before Petrocelli killed Wilson.  In opining about Petrocelli's mental status,

26  Dr. Petrich did not have the benefit of knowing about those two killings, nor the statements and

conduct of Petrocelli with regard to them.  Second, Dr. Petrich made clear that the goals of control

of Petrocelli's mood swings and alcohol and drug rehabilitation would require an intensive treatment

program.  However, the jury heard that, following the kidnapping conviction, and before he killed

Barker and Wilson, Petrocelli had twice left a drug rehabilitation program, after only one day on

each occasion.  On cross examination in the penalty phase of his trial, Petrocelli testified as follows:

> Q:     How long did you stay with the drug rehabilitation?
>
> A:     One day.
>
> Q:     Then you came to Reno, isn't that correct?
>
> A:     Yes.
>
> Q:     Then you were arrested at gunpoint at a bank in Sparks?
>
> A:     Yes.
>
> Q:     Then returned to the State of Washington?
>
> A:     Yes.
>
> Q:     Then placed back on probation by the judge?
>
> A:     Yes.  I was put back on the drug program.
>
> Q:     How long did you stay the second time?
>
> A:     One day.

Exhibit U, p. 56  (ECF No. 75, p. 59).  Because Dr. Petrich's report was written before Petrocelli

twice rejected the sort of treatment recommended by Dr. Petrich, and before Petrocelli killed Barker

and Wilson, his opinion that Petrocelli, with treatment, would pose minimal risk to the public,

carried little evidentiary weight.

Defense Exhibit 2, in the penalty phase of the trial, was a report by John N. Chappel, M.D.,

of a psychiatric evaluation of Petrocelli, dated July 20, 1982.  Exhibit J3, pp. 9-13 (ECF No. 71-2,

pp. 59-63).  Dr. Chappel's report includes portions graphically conveying Petrocelli's[10] potential for

violence:

---

[10]  "John Maida" was an alias used by Petrocelli.

1    Mr. Maida spent three years in the Marines. He denies any thoughts of killing anyone
     until he entered the service. His goal up to that time had been to play professional
2    baseball. He was "scared of killing. But, they emphasized it until I believed I could."
     On one occasion a fellow marine kicked his bunk, "I pulled my gun and said I'll kill
3    you." He was courtmartialed for this episode. In fights prior to being in the Marines
     Mr. Maida would regularly lose. However, in the Marines "I found I started enjoying
4    it.  I knew I could kill – if they pushed me."

5    Once when he was in Alaska he got into a fight with a man who was much bigger.
     He won that fight and afterwards the man told him that he had backed off when he
6    became convinced that Mr. Maida would kill him if they continued. "People told me
     they could see death in my eyes."
7
                                          *    *    *
8
     The major disturbance at the present time is emotional. Mr. Maida is both depressed
9    and angry. The depression is expressed through sobbing and tears. He had considered
     suicide several times, both in the jail in Seattle and in Washoe County, where he
10   earlier tried to hang himself. His anger and rage are directed primarily at the police
     and the district attorneys in Seattle and Washoe County. He considers the Washoe
11   County District Attorney as premeditating his murder. When his rage occurs Mr.
     Maida threatens to kill the prosecutor.
12
13   Exhibit J3, pp. 10, 12 (ECF No. 71-2, pp. 60, 62).  Dr. Chappel wrote the following under the

14   heading "Diagnostic Impression":

15        Impulse control disorder.

16        Antisocial personality disorder

17        On the basis of the above examination it is my opinion that Mr. Maida is legally
          competent to stand trial. He has a factual understanding of the charges against him.
18        He has sufficient mental capacity to understand the difference between right and
          wrong and to be able to cooperate with counsel in preparation of his defense.
19
          It is further my opinion that a more extensive evaluation of Mr. Maida might serve
20        some useful purposes. First, it would be useful to him to have a better understanding
          of the reasons for his loss of impulse control and his reason for killing someone who
21        was close to him. Second, if Mr. Maida is not sentenced to death and executed, it is
          my opinion that in his current state of mind he is very dangerous to those people to
22        whom his rage is directed. A period of evaluation and a trial of treatment might serve
          a useful purpose in preventing any further homicidal outbursts of rage on his part.
23        There is a third reason for having evaluation and treatment before his trial. In his
          present state of mind he is likely to display some of his impulsive and angry behavior
24        in the court room. This could be damaging, prejudicial, and dangerous.

25   *Id*. at 12-13 (ECF No. 71-2, pp. 62-63).  So, in essence, Dr. Chappel characterized Petrocelli as

26   "very dangerous" and subject to "homicidal outbursts of rage," and supported that characterization

                                             33

1   with detailed background information, but suggested that "[a] period of evaluation and a trial of

2   treatment *might* serve a useful purpose in preventing any further homicidal outbursts of rage on his

3   part." *Id*. (emphasis added).

4           Defense Exhibit 1, in the penalty phase of the trial, was a report by Martin E. Gutride, Ph.D.,

5   of a psychological evaluation of Petrocelli, dated July 30, 1982.  Exhibit J3, pp. 14-18 (ECF No. 71-

6   2, pp. 64-68).  After setting forth background information about Petrocelli's life, Dr. Gutride's report

7   states that he believed Petrocelli to be "faking bad" in his responses to psychological testing.  *Id*. at

8   17 (ECF No. 71-2, p. 67).  The report continues:

9           The pattern of the client's responses, however, point to some basic characteristics
            which appear valid for him. Specifically, he is a very impulsive individual who
10          functions completely emotionally when upset. At such times, he does not exercise
            any control or rational thinking processes. He is an angry person, with a high
11          potential for violence. He seems to view his life as a struggle against authority and
            "the system." He is unlikely to act within normal social conventions. The client is
12          very mistrustful of others and seems very much alone in the world. He has little sense
            of connectiveness with parent figures, particularly mother. He may find it quite
13          difficult to establish and maintain positive heterosexual relationships. There are
            indications the client may have a death wish and his history of suicide attempts, as
14          well as violence towards others, makes him a relatively high suicide risk at this time.

15  *Id*. at 17-18 (ECF No. 71-2, pp. 67-68).  Dr. Gutride's report concludes as follows:

16          The diagnostic impression based on history and his response style during this
            evaluation is that of an antisocial personality with paranoid features. He is capable of
17          losing contact with reality when emotionally upset and behaving purely emotionally,
            with little concern for what he's doing. The personal distress he exhibited during the
18          interview seems genuine and the client may truly desire some mental health
            treatment. His ability to profit from such treatment is questionable [due] to the depth
19          of this client's distrust of others. He can be quite dangerous to others as well as
            himself and treatment should be offered in a setting where the client can be closely
20          monitored.

21  *Id*. at 18 (ECF No. 71-2, p. 68).  In his testimony in the prosecution's rebuttal case, in the penalty

22  phase of the trial, Dr. Gutride reiterated that he felt that Petrocelli had been faking in his responses

23  to the testing, and he went on to testify as follows, regarding the nature of an antisocial personality

24  disorder:

25          Q:      Does an unsocial personality in – have anything to do with being
                    insane or insanity?
26

34

1          A:     It does not imply an individual is unable to think properly or conduct
2     themselves conventionally. It relates mostly to a style of living. Unsocial with
paranoid tendencies.

3  Exhibit U, p. 64  (ECF No. 75, p. 67).  In short, Dr. Gutride found Petrocelli to be "quite

4  dangerous," and "an angry person, with a high potential for violence," and opined that Petrocelli's

5  "ability to profit from ... treatment is questionable."  Exhibit J3, pp. 17-18 (ECF No. 71-2,

6  pp. 67-68).

7       Against this background, with respect to the evidence concerning Petrocelli's potential

8  for future dangerousness, in response to the defense's introduction into evidence of the reports of

9  Dr. Petrich, Dr. Chappel, and Dr. Gutride, the prosecution called Dr. Gerow to testify.  Exhibit U,

10  pp. 65-69 (ECF No. 75, pp. 68-72).  Dr. Gerow testified – consistent with the opinions of

11  Dr. Chappel and Dr. Gutride – that he diagnosed Petrocelli as having a psychopathic or antisocial

12  personality.  *Id.* at 66 (ECF No. 75, p. 69).  Dr. Gerow explained that the two terms, "psychopathic

13  personality" and "antisocial personality," are synonymous.  *Id.*  Dr. Gerow testified as follows:

14          Q:     Would you describe a psychopathic personality?

15          A:     Everybody has a personality. A psychopathic personality is
16     fortunately, a rare personality. It's someone who is very callous and selfish, someone
unreliable and irresponsible. It's someone who cannot form ties to other people,
17     someone who is superficial in their relationship –

18                              *   *   *

19          A:     Someone who forms superficial relationships with other people
because they are unable to form strong ties or feel deeply about other people.

20          Q:     What is the person's ability to live within the law?  How does that
21     person relate to society?

22          A:     People with psychopathic personalities are repeatedly in trouble with
the law.

23          Q:     What's the reason?

24          A:     The reasons primarily are that they don't believe in the rules that
25     society set up that governs the rest of us. They ignore the rules and are therefore
constantly in trouble. The other reason is when they get in trouble they don't learn
from it so they continue to get into trouble because the experience of punishment
26     doesn't help us.

Q:    Is there any treatment for a psychopathic personality?

A:    There is no treatment at all. A psychiatrist doesn't treat the condition because it's not treatable.

Q:    Is it long-standing or does it go away?

A:    It starts early in life, it gets considerably worse during the adolescent years and doesn't go away. It persists throughout life.

Q:    What's the violence potential of a psychopathic?

A:    It varies among psychopathics but people who have this personality problem, who have a history of violence, tend to repeat violent actions because they don't learn from experience or punishment, so the propensity for further violence is quite high.

                              *    *    *

Q:    Is being a psychopathic, is that in your opinion, a mental disturbance?

A:    Yes, it's a mental disturbance.

Q:    Is it an emotional disturbance?

A;    Yes, it's an emotional disturbance.

Q:    For which there is no cure?

A:    There is no cure.

*Id*. at 66-68 (ECF No. 75, pp. 69-71).  It is notable that none of this testimony by Dr. Gerow relied at all upon his examination of Petrocelli; rather, in this testimony, Dr. Gerow merely conveyed his opinions about psychopathy and antisocial personality disorder, in general.  This testimony was proper, despite the arguable violations of Petrocelli's rights under the Sixth Amendment and vis-a-vis the psychotherapist-patient privilege.  The only testimony by Dr. Gerow that related his opinions about psychopathy and antisocial personality disorder to Petrocelli, in particular, was the following:

Q:    How does that relate to Mr. Petrocelli? You said you diagnosed him as a psychopathic. How do all the things – the no cure, the callousness, how does that apply to him?

A:    I think that describes him quite well.

Q:    Everything that you have of the individual –

36

1        A:      Yes?

2    *Id*. at 68 (ECF No. 75, p. 71).

3        The prosecutor addressed the doctors' opinions about Petrocelli's mental status, in his

4    closing argument, as follows:

5            Number two. The murder was committed while the defendant was under the
        influence of extreme mental or emotional distress. Now, all the doctors have said that
6        Mr. Petrocelli is an antisocial, also known as a psychopath, which means he is unable
        – he will not live within society, will not live within the rules, does what he pleases,
7        victimizes, is callous and cool and manipulative, and does all these things, which of
        course, we saw evidence of in this case. All three doctors have agreed. It's unusual
8        for doctors to agree. It's extremely unusual for doctors to agree. But they do in this
        case and each one of them says, Dr. Gutride, that he is an angry person with a high
9        potential of violence. He seems to view his life as a struggle against authority and
        such. He is unlikely to act within normal society's conventions. Dr. Gutride says, his
10       ability to profit from such treatment, in other words, treatment of this – Dr. Gerow
        has said there is no treatment, he will be a psychopathic personality unfortunately.
11       "Very rare," Dr. Gerow said. His ability to profit from such treatment is
        questionable. He can be quite dangerous to us, to others. That's Dr. Gutride.

12
            Dr. Chappel. Dr. Chappel is not consistent as to the date. He discusses, in his
13       opinion, the current state of mind as very dangerous to most people at whom his rage
        is directed – and the antisocial personality. And we have one other report which I will
14       be getting back to. This other report – is a duplicate – of Mr. Petrocelli in Seattle, of
        the kidnapping, and I commend it to you for great knowledge. That's the report on
15       which he got probation.

16           Remember what Mr. Petrocelli did with Mr. Gutride was in defect when he
        said he was faking, -- faking it up -- being manipulative of the doctor. The doctor
17       goes on, selfish, antisocial personality. He was put on an alcohol and drug
        rehabilitation, and appears to present a minimal risk to the community. To the rest of
18       this, it discusses, that he was placed in an alcohol rehabilitation center from which he
        escaped, and first came to Reno, was sent back and placed back in the rehabilitation
19       center where he escaped the first date, and killed the victim of the kidnapping.

20           This report is not worth the paper it's written on. One, it's a year ago. Two,
        three doctors here are able to see the true Tracy Petrocelli, and his aims, have said
21       that he is a psychopath and I submit to you that although, perhaps maybe if you
        stretch the word and thought, that might be a mitigating circumstance because it
22       might be extreme mental or emotional disturbance. I would submit to you, implicit in
        that is, there is treatment available for this person. What psychopath means,
23       essentially, is a mean, bad person who has never changed and who will continue to
        victimize.

24

25

26

37

1    Exhibit U, pp. 82-84 (ECF No. 75, pp. 85-87).[11]   The prosecutor revisited this issue in his rebuttal

2    argument:

3         When you have been diagnosed by three doctors as being a psychopath,
          callous, a cold and manipulative killer – an affliction – like psycho, a psychotic,
4         where you're insane, but an affliction is not a psychopath, a psychopathic killer,
          which is what Tracy Petrocelli is. It's a perversion of the language and a
5         humanitarian spirit in the mitigating circumstances, is called being a person who will
          continue to kill, a person who will continue to rob and will continue to steal because
6         he just doesn't give a darn about other people. He's callous, insensitive, and selfish.
          It's a perversion of the state statutes, it's a perversion of the word mitigating, to call
7         that an affliction, and to put Tracy Petrocelli in the same group of people who need
          help, mentally ill people.
8
          Mr. Wishart [defense counsel] made reference to the fact that Dr. Chappel
9         talked about a treatment plan and that Dr. Gerow at all talks about a treatment plan
          too, and draws of that that Melanie Barker is dead and James Wilson is dead, but
10        reads carefully within what Dr. Chappel says, an excellent psychiatrist, he thinks he
          is terrible here – he says, if placed under sentence of death and executed, then it's my
11        opinion the current state of mind, that he is dangerous to most people who are in the
          direction of his rage. That a period of evaluation and a time of treatment might serve
12        a reasonable purpose. It might serve a purpose in preventing more murders.  Do we
          take that chance? By the way, what do we say?  And this is a concern to other
13        prisoners in prison with Mr. Petrocelli when we say, "Here is Mr. Petrocelli to spend
          some years among you; he is a homocidal (sic) psychopathic, dangerous to those at
14        whom his rage is directed."

15        If he gets some treatment we might be able to prevent anymore murders –
          might – what do we say to them?
16
          Dr. Gutride, "His ability to profit from treatment is questionable due to the
17        depth of this client's distrust of others." He can be quite dangerous to others. As well
          as, also, even if treatment should be offered, if it is, because these are doctors, all
18        within a setting where the clients can be closely monitored so he – so he doesn't kill
          anyone, is what it means. That's me – not the doctor – so he doesn't kill anyone. He
19        isn't likely, say the doctors, to act within normal social conventions. That's stated
          unqualified there. And we can go to Dr. Gerow.  Ladies and gentlemen, that he says
20        he is mentally sick could be confused in mitigating, but to call Tracy Petrocelli a sick
          man – because sick implies an ability to be cured but the sad and terrifying fact is he
21        will continue to do this.

22                                    *    *    *

23        There is the statement he will not learn from punishment. He will not learn, he cannot
          learn.
24

25

26        _____

              [11]  Dr. Gutride's name and Dr. Chappel's name are misspelled in parts of the transcript.  Those
          misspellings are corrected here.

                                          38

1    *Id*. at 92-94 (ECF No. 75, pp. 95-97).  The closing argument of the prosecutor illustrated that

2    Dr. Gerow's opinions did not stand out appreciably from, or add significantly to, the opinions of

3    Drs. Chappel and Gutride.

4           If, as is here assumed, the testimony of Dr. Gerow violated Petrocelli's rights, the violation

5    would justify overturning Petrocelli's death sentence only if Petrocelli could establish that the error

6    "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v.*

7    *Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

8    (1946)); *see also Pizzuto v. Arave*, 280 F.3d 949, 970 (2002) (applying harmless error analysis to

9    Fifth and Sixth Amendment violations, for using "uncounseled, non-Mirandized statements" against

10   capital defendant).  The court finds that Petrocelli has not made any such showing.  Dr. Gerow's

11   testimony was largely academic, in that, for the most part, it did not focus on Petrocelli specifically,

12   but rather consisted mainly of his opinions about psychopathy and antisocial personality disorder in

13   general.  Furthermore, Dr. Gerow's testimony was not so divergent from the testimony of Drs.

14   Chappel and Gutride so as to significantly affect the outcome of the trial.  Moreover, there was

15   ample evidence, aside from the testimony of Dr. Gerow, that Petrocelli would pose a danger to

16   others in the future:  the evidence of Petrocelli's killing of Wilson and Petrocelli's behaior

17   immediately following that killing; Lloyd Maloney's testimony about Petrocelli's killing of

18   18-year-old Melanie Barker less than six months before he killed Wilson; the testimony of Maureen

19   Lawler, Barker's mother, about Petrocelli's kidnapping of Barker about a year before Wilson's

20   murder; Lawler's testimony that, in a telephone conversation with Petrocelli prior to his kidnapping

21   of Barker, Petrocelli threatened to "blow [her] away;" the testimony of John J. Lukas, who had been

22   in jail with Petrocelli while Petrocelli was awaiting trial, that Petrocelli wanted him to help with an

23   escape attempt, and threatened him; Lukas' testimony that Petrocelli told him that after his escape he

24   planned to "get rid of" a woman he considered a snitch, and planned to also "get rid of" the district

25   attorney; Dr. Petrich's opinion that Petrocelli would require "intensive treatment" in order to present

26   minimal danger to the community; Petrocelli's testimony that he twice left drug treatment after one

day; Dr. Chappel's opinion that if Petrocelli "is not sentenced to death and executed, it is my opinion that in his current state of mind he is very dangerous to those people to whom his rage is directed;" Dr. Gutride's opinion that Petrocelli's ability to profit from treatment "is questionable [due] to the depth of [his] distrust of others," and that "he can be quite dangerous to others as well as himself and treatment should be offered in a setting where the client can be closely monitored."  In view of the nature of Dr. Gerow's testimony, and in view of the other evidence regarding Petrocelli's capacity for violence, the court finds that Petrocelli has not shown that the testimony of Dr. Gerow had a substantial and injurious effect or influence in determining the jury's verdict.

With respect to Petrocelli's related claims of ineffective assistance of his appellate counsel, for failing to assert his claims regarding the testimony of Dr. Gerow on direct appeal, a petitioner claiming ineffective assistance of counsel must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Petrocelli has not shown that there is a reasonable probability that, had the claims regarding Dr. Gerow been raised on appeal, the outcome in state court would have been different.

The court will deny Petrocelli habeas corpus relief with respect to Ground 12.

Certificate of Appealability

This is a final order adverse to the petitioner.  Therefore, Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts mandates that this court must issue or deny a certificate of appealability.  *See* 28 U.S.C. § 2253(c); Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. App. P. 22(b).

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c).  The Supreme Court has interpreted 28 U.S.C. §2253(c) as follows:

1

2

3

4

5

6

   Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

7   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

8   (9th Cir.2000).

9      The court finds that, applying these standards, a certificate of appealability is warranted with

10   respect to Grounds 6(d), 12, and 13, of Petrocelli's fourth amended habeas petition.  The court will

11   grant a certificate of appealability as to those claims.  The court declines to issue a certificate of

12   appealability for Petrocelli's remaining claims.

13      **IT IS THEREFORE ORDERED** that petitioner's fourth amended petition for writ of

14   habeas corpus (ECF No. 162) is **DENIED**.

15      **IT IS FURTHER ORDERED** that petitioner is granted a certificate of appealability with

16   respect to Grounds 6(d), 12, and 13 of his fourth amended petition for writ of habeas corpus.

17      **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

18

19     Dated this 8th day of October, 2013.

20

21

22             UNITED STATES DISTRICT JUDGE

23

24

25

26

41